1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
   Alan R. Plutzik, Of Counsel (Bar No. 077758)
2  L. Timothy Fisher, Of Counsel (Bar No. 191626)
   2125 Oak Grove Road, Suite 120
3  Walnut Creek, CA 94598
4  Telephone: (925) 945-0770
   Facsimile: (925) 945-8792
5
   *Attorneys for Plaintiffs*
6
7  [Additional Counsel Appear on Signature Page]

8                **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**



10  ABRENA WINSTON, Individually and On Behalf
11  of All Others Similarly Situated,

                                              CIVIL ACTION NO.
12
13                          Plaintiff,         C07-05327
14        vs.                                  CLASS ACTION COMPLAINT
15
16  BIGBAND NETWORKS, INC., AMIR BASSAN-
    ESKENAZI, RAN OZ, FREDERICK BALL, GAL       **JURY TRIAL DEMANDED**
17  ISRAELY, DEAN GILBERT, KEN GOLDMAN,
    LLOYD CARNEY, BRUCE SACHS, ROBERT
18  SACHS, GEOFFREY YANG, MERRILL LYNCH,
    PIERCE, FENNER & SMITH INC., MORGAN
19  STANLEY & CO. INC, COWEN & CO.,
    JEFFERIES & CO., and THINKEQUITY
20  PARTNERS, LLC.,
21
22                          Defendants.

23        Plaintiff, Abrena Winston ("Plaintiff"), alleges the following based upon the investigation by

24  Plaintiff's counsel, which included, among other things, a review of the defendants' public

25  documents, conference calls and announcements made by defendants, United States Securities and

26  Exchange Commission ("SEC") filings, wire and press releases published by and regarding BigBand

27  Networks, Inc. ("BigBand" or the "Company"), securities analysts' reports and advisories about the

28

Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the common stock of BigBand, who purchased or otherwise acquired BigBand's common stock pursuant or traceable to the Company's March 14, 2007 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.     BigBand develops, markets, and sells network-based platforms that enable cable operators and telephone companies to offer video, voice and data services across coaxial, fiber and copper networks.  The Company's product applications of Digital Simulcast, TelcoTV, Switched Broadcast, High-Speed Data and Voice-over-IP are used by service providers worldwide to offer video, voice, and data services to subscribers.

3.     On March 14, 2007, the Company commenced its IPO.  In connection with its IPO, the Company filed a Registration Statement and Prospectus (collectively referred to hereinafter as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company and certain selling stockholders, as they sold 10.7 million shares of stock to investors at a price of $13.00 per share, for gross proceeds of $139.1 million.

4.     On August 2, 2007, the Company shocked investors when it reported disappointing second quarter 2007 financial results, and announced lowered guidance for its third quarter 2007 and year-end 2007. Specifically, the Company stated that third quarter net revenues would be $54 to $58 million, and earnings (loss) per share ("EPS") would be ($0.01) to $0.03.  Further, for fiscal year 2007, the Company stated that net revenues would be in the range of $225 to $230 million, and EPS would be in the range of $0.03 to $0.08.

5.    On this news, shares of the Company's stock fell $3.88 per share, or 27.75 percent, to close on August 3, 2007 at $10.10, on unusually heavy trading volume.

6.    Then on September 27, 2007, the Company revised its revenue outlook for the third quarter of 2007, and indicated that revenue would be in the range of $35 to $39 million, well below its previous guidance of $54 to $58 million for the quarter. The Company revealed that the lower revenue outlook resulted from the Company deploying switched digital video ("SDV") across a number of customers and configurations, which required significant software customization and integration. Additionally, the Company disclosed that it had experienced a slowdown in TelcoTV revenues as its major customer worked through existing inventory. As a result, the Company stated that it expected to report an operating loss for the third quarter of fiscal year 2007.

7.    On this news, shares of the Company's stock declined an additional $2.67 per share, or almost 30 percent, to close on September 28, 2007 at $6.40 per share, also on unusually heavy trading volume.

8.    The Complaint alleges that the Registration Statement failed to disclose or indicate the following:  (1) that the Company's SDV products suffered from interoperability issues with regard to certain video infrastructure systems; (2) that the integration of the Company's SDV products required significant software customization and integration; (3) as such, growth of the Company's SDV products and sales was stagnant; (4) that, as a result of the above, the Company would be forced to recognize the revenue associated with its SDV product sales over an extended period of time; (5) that the Company had shipped excess amounts of TelcoTV inventory to customers such as Verizon, which reduced future demand for these products; and (6) that the Company lacked adequate internal and financial controls.

9.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

12.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's principal executive offices are located within this Judicial District.

13.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.    Plaintiff, Abrena Winston, as set forth in the accompanying certification, incorporated by reference herein, purchased BigBand's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

15.    Defendant BigBand is a Delaware corporation with its principal executive offices located at 475 Broadway Street, Redwood City, California.

16.    Defendant Amir Bassan-Eskenazi ("Bassan-Eskenazi") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

17.    Defendant Ran Oz ("Oz") was, at all relevant times, the Company's Chief Technology Officer ("CTO"), Executive Vice President, and a member of the Board of Directors.

1   18.   Defendant Frederick Ball ("Ball") was, at all relevant times, the Company's Financial

2   Officer ("CFO"), Senior Vice President, and Executive Vice President.

3   19.   Defendant Gal Israely ("Israely") was, at all relevant times, a member of the

4   Company's Board of Directors.

5

6   20.   Defendant Dean Gilbert ("Gilbert") was, at all relevant times, a member of the

7   Company's Board of Directors.

8   21.   Defendant Ken Goldman ("Goldman") was, at all relevant times, a member of the

9   Company's Board of Directors.

10   22.   Defendant Lloyd Carney ("Carney") was, at all relevant times, a member of the

11   Company's Board of Directors.

12

13   23.   Defendant Bruce Sachs ("B. Sachs") was, at all relevant times, a member of the

14   Company's Board of Directors.

15   24.   Defendant R. Sachs ("R. Sachs") was, at all relevant times, a member of the

16   Company's Board of Directors.

17   25.   Defendant Geoffrey Yang ("Yang") was, at all relevant times, a member of the

18   Company's Board of Directors.

19   26.   Defendants Bassan-Eskenazi, Oz, Ball, Israely, Gilbert, Goldman, Carney, B. Sachs,

20   R. Sachs, and Yang are collectively referred to hereinafter as the "Individual Defendants." The

21   Individual Defendants, because of their positions with the Company, possessed the power and

22   authority to control the contents of BigBand's quarterly reports, documents, and presentations to

23   securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each

24   defendant was provided with copies of the Company's reports and documents alleged herein to be

25   misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their

26   issuance or cause them to be corrected. Because of their positions and access to material non-public

27

28   information available to them, each of these defendants knew that the adverse facts specified herein

CLASS ACTION COMPLAINT

had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

27.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") was a joint lead underwriter of the Company's IPO.

28.    Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") was a joint lead underwriter of the Company's IPO.

29.    Defendant Cowen & Co. ("Cowen") was a co-manager of the Company's IPO.

30.    Defendant Jefferies & Co. ("Jefferies") was a co-manager of the Company's IPO.

31.    Defendant ThinkEquity Partners, LLC ("ThinkEquity") was a co-manager of the Company's IPO.

32.    Defendants Merrill Lynch, Morgan Stanley, Cowen, Jefferies, and ThinkEquity are collectively referred to hereinafter as the "Underwriter Defendants." In addition to underwriting the Company's IPO, the Underwriter Defendants also served as financial advisors and assisted in the preparation of BigBand's IPO materials.

## SUBSTANTIVE ALLEGATIONS

### Background

33.    BigBand develops, markets, and sells network-based platforms that enable cable operators and telephone companies to offer video, voice and data services across coaxial, fiber and copper networks. The Company's product applications of Digital Simulcast, TelcoTV, Switched Broadcast, High-Speed Data and Voice-over-IP, which are used by service providers worldwide to offer video, voice, and data services to subscribers.

34.    On March 14, 2007, the Company issued a press release entitled "BigBand Networks Announces Pricing of Initial Public Offering." Therein, the Company, in relevant part, stated:

- 6 -

1
2
3
4
5
6

BigBand Networks, Inc. (NASDAQ: BBND) today announced an initial public offering of 10,700,000 shares of its common stock at a price of $13.00 per share (before underwriting discounts and commissions). Of those shares, BigBand Networks will sell 7,500,000 shares and selling stockholders will sell 3,200,000 shares. Several of its stockholders have granted the underwriters the right to purchase an additional 1,605,000 shares of common stock to cover over-allotments. BigBand's common stock will be listed on the Nasdaq Global Market under the symbol "BBND" and will begin trading on March 15, 2007.

7
8
9

Morgan Stanley and Merrill Lynch & Co. acted as joint book-running managers for the offering, with Jefferies & Company, Cowen and Company, and ThinkEquity Partners LLC serving as co-managers.

10    35.    Also on March 14, 2007, the Company commenced its IPO. In connection with its

11 IPO, the Company filed a Registration Statement with the SEC. The IPO was a financial success for

12 the Company and certain selling stockholders, as they sold 10.7 million shares of stock to investors

13 at a price of $13.00 per share, for gross proceeds of $139.1 million.

14

15

**Materially False and Misleading
Statements Made in the Registration Statement**

16
17

36.    Regarding the Company's business, operations, and competitive strengths, the

18 Registration Statement, in relevant part, stated:

19
20
21
22
23
24

Our software and hardware product applications are used by leading service providers worldwide to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We have sold our product applications to more than 100 customers globally, including Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States. Our net revenues increased 80.3% to $176.6 million for the year ended December 31, 2006 from $98.0 million in 2005. *We have been profitable on a quarterly basis since the three months ended September 30, 2006, and we first achieved profitability on an annual basis in 2006.*

25

* * *

26
27

**Competitive Strengths of BigBand**

28

We have core expertise in media processing, communications networking and bandwidth management. We hold 26 U.S. patents, 16 of which relate to our video products and ten of which relate to our

- 7 -

data products. *Our expertise in emerging technologies, such as switched broadcast, and our customer relationships with large service providers are key strengths that enable us to gain greater insight into the network requirements of our customers. Leveraging this expertise, we combine our fully programmable hardware and modular software architecture to deliver product applications designed to meet service provider needs for intelligent, high-bandwidth networks. Our products are interoperable with a broad range of content and services in various parts of a service provider's network.* Further, we believe our product applications decrease our customers' total cost of ownership, reduce their time-to-market with new services and improve their ability to achieve more efficient bandwidth utilization. [Emphasis added.]

37.    In describing the Company's "solution," the Registration Statement, in relevant part, stated:

**The BigBand Solution**

We develop, market and sell network-based platforms that enable service providers to offer video, voice and data services across coaxial, fiber and copper networks. Our software and hardware product applications are used to offer video, voice and data services commercially to tens of millions of subscribers, 24 hours a day, seven days a week and have been successfully deployed by leading service providers worldwide including six of the ten largest service providers in the United States.

We combine rich media processing, modular software and high-speed switching and routing with carrier-class hardware configurations into product applications designed to address specific service provider needs. Our product applications enable service providers to deliver high-quality video, voice and data services and offer more effective video advertising. Our key product applications include Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP.

Our solution offers the following key benefits:

- *Intelligent Bandwidth Management.* Using our product applications, service providers can address their increasing bandwidth needs. For example, we offer what we believe to be the only switched broadcast application commercially deployed today. Our Switched Broadcast product application only transmits channels to subscribers when the subscribers in a service group are in the process of watching those channels, instead of broadcasting all channels to all subscribers all the time. This enables service providers to achieve up to 50% savings in

CLASS ACTION COMPLAINT

bandwidth usage for digital subscribers, allowing service providers to offer additional services without altering the subscriber viewing experience. One of our customers that had used all of its available bandwidth capacity for existing channel programming was able to use our Switched Broadcast product application to add new, higher revenue HDTV channels without dropping existing channels.

- *High-Quality Video Experience.* Our product applications allow service providers to minimize the likelihood of video quality errors by detecting potential video quality degradation in real-time and correcting such degradation before the video stream is delivered to subscribers. Our core suite of video processing software modules are designed to enhance the richness of the viewing experience by optimizing the delivery of video streams, while our program level redundancy functionality adds the switching capability to automatically provision an alternative video stream should the quality of the primary stream begin to degrade.

- *Enhanced Video Personalization.* Using our product applications, service providers interact with their subscribers down to the individual channel change and, as a result, can more accurately tailor programming packages to the interests of their subscribers. For example, our Switched Broadcast product application enables service providers to satisfy consumer demand for increasingly personalized content by expanding the number of channels that can be offered because selected channels are only delivered when the channel is requested by a subscriber in the service group. Using this application, one of our customers was able to offer additional channel packages tailored to demographic groups.

- *Ability to Deliver Relevant Video Advertising.* Our product applications allow service providers to insert advertising tailored to specific subscriber groups. For example, using our Digital Simulcast application, service providers can simultaneously insert different ads into multiple copies of the same program and forward them to specific geographic zones. This allows service providers to attract advertisers interested in reaching niche markets.

- ***Optimize Return on Existing Infrastructure Investment. Our network-based product applications allow service providers to manage service quality from the network, rather than deploying costly personnel and equipment at the customer premises. Because our product applications are deployed at the network level, service providers can leverage their infrastructure investment across many subscribers and avoid the hardware***

CLASS ACTION COMPLAINT

1   *and service costs associated with an upgrade of equipment in*
2   *the homes of subscribers. For example, using our M-CMTS*
    *architecture, service providers will be able to quadruple the*
3   *existing downstream capacity of our High-Speed Data product*
    *application without the need to replace CPE. The need for*
4   *higher speeds is increasingly required for the delivery of video*
    *over the Internet.*
5

6   •   *Platform Flexibility.*   Our product applications feature a fully
        programmable hardware and modular software architecture. Our
7       field-upgradable hardware is designed to meet service provider
        platform flexibility requirements and to minimize the need to
8       replace existing hardware. For example, one customer initially
        purchased our equipment for basic media processing functionality
9       and was subsequently able to further enhance this same hardware
        platform within a matter of hours to deliver our advanced Digital
10      Simulcast product application simply by licensing an additional
11      software application from us.  [Emphasis added.]

12      38.   With regard to the Company's strategy, the Registration Statement, in relevant part,

13   stated:

14      **Strategy**

15      Our objective is to be the leading provider of network-based products
16      that enable the delivery of high-bandwidth, high-quality video, voice
        and data services and more effective video advertising. Key elements
17      of our strategy include the following:

18   •   ***Further Technology Leadership Position.    Over the past eight***
19      ***years, we have developed differentiated media processing and***
        ***video systems design expertise. We used our media processing***
20      ***expertise to deliver what we believe to be the only switched***
        ***broadcast product commercially deployed today. We are also***
21      ***building upon our IP networking and media processing***
        ***expertise to develop the first M-CMTS solution. We will***
22      ***continue leveraging our expertise to deliver products that focus***
        ***on optimizing network infrastructure and enabling delivery of a***
23      ***high-quality user experience.***

24   •   *Leverage Modular Architecture to Accelerate New Product*
25      *Introduction.*   We have created a series of media processing
        software modules that, when combined with our programmable
26      hardware and switching fabric, serve as the foundation for a range
        of network-based product applications. The competition between
27      cable operators and telephone companies is accelerating the rate
        of change in their networks, and we believe our software modules
28

- 10 -
CLASS ACTION COMPLAINT

will serve as the foundation for rapidly delivering solutions that address our customers' bandwidth and service delivery needs.

- *Expand Footprint Within Existing Customer Base. We are intensely customer focused. We have customer relationships with a number of service providers both in the United States and internationally, including six of the ten largest service providers in the United States. We believe these customer relationships give us a strong advantage in understanding our customers' network challenges and delivering timely solutions, as we did with our Switched Broadcast product application. We will continue to work closely with our customers on the designs of their network architectures and emerging services, expand our relationships with these customers to deploy more of our existing applications, and develop and deliver new applications to address their network challenges.*

- *Expand Customer Base Regardless of Access Technology. Service providers deploy video, voice and data services to subscribers across networks based on coaxial, fiber and copper. We have successfully deployed our product applications across these access technologies. We are currently providing Verizon with a solution that allows both digital and analog transmission of video over fiber-optic lines. Other telephone companies deploying video services over existing DSL lines leverage our media processing expertise to provide such video services. Still others use our product applications to carry services over coaxial cable. We intend to leverage our media processing expertise to penetrate new customers worldwide, regardless of the type of access networks they use.*

- *Broaden Addressable Advertising Capabilities.* We currently enable service providers to insert video advertisements targeted to subscribers in specific geographic zones. We intend to collaborate with our customers to continue developing and deploying next-generation advertising solutions and are currently in field trials with a leading cable operator for the delivery of ads tailored down to the individual subscriber level.

- *Leverage Video Over IP Expertise.* We believe that service providers will seek to offer live and on-demand video services to an increasing array of IP-capable devices, such as TVs, personal computers, mobile phones and portable devices, as well as attempt to integrate video, VoIP and data into new services. This will create a need for platforms that integrate video processing and IP networking. Since inception, our development efforts have focused on combining networking with real-time processing of video. *Our M-CMTS architecture is the first step in our plan to meet the market demand for video over IP by enabling cable*

CLASS ACTION COMPLAINT

*operators to more cost effectively offer bandwidth to IP-enabled devices. We intend to further leverage our video expertise to provide a broader array of solutions to cable operators as they scale their video-enhanced triple-play services directed at PCs and other IP-capable devices.* [Emphasis added.]

39.     Regarding the Company's product applications, the Registration Statement, in relevant part, stated:

**Product Applications**

We deliver product applications that provide rich media processing and high-speed switching and routing, which enable service providers to offer advanced video, voice and data services to subscribers and advertisers. Our product applications are a combination of our video or data hardware platforms and key software modules that run inside our carrier-class hardware platforms and deliver the application-specific functions.

**Video**

We combine our carrier-class hardware platforms and modular media processing software to deliver the following product applications:

*Digital Simulcast.     We were first to implement what we believe has become the industry's de facto network architecture for digital simulcast.* Historically, video content was broadcast only in analog form. Analog video presents a number of limitations to service providers, including deterioration of video quality, higher cost to insert relevant advertising in the video stream, and the cost of converting analog to digital for certain digital devices in the home, such as digital video recorders.

***Our Digital Simulcast product application enables service providers to create a digital version of analog inputs and deliver both analog and digital video streams to subscribers.*** This gives service providers a cost-efficient way of migrating subscribers from analog to digital video, which uses lower cost all-digital set-top boxes, while still supporting a large installed base of analog set-top boxes and televisions. In addition, using our Digital Simulcast product application, service providers can overcome the video quality limitations inherent in the transport of analog over long distances and the low-quality conversion from analog to digital in consumer digital devices. They also can reduce their investment in costly equipment used to transport analog signals and achieve operational efficiency by using a converged digital network. Finally, our Digital Simulcast application allows service providers to insert advertisements into the digital video stream and deliver those ads either in digital or analog

form to subscribers. This offers our customers incremental revenue opportunities through the ability to insert advertisements into the digital stream targeted to specific geographic zones.

We deliver our Digital Simulcast product application by combining our Broadband Multimedia-Service Router hardware platform, which we refer to as our BMR, with our core media processing modules with advanced splicing capability.

*TelcoTV.* Telephone companies use our BMR to provide a very high-quality viewing experience, while still benefiting from the use of digital video transport throughout their networks. We enable telephone companies to leverage their existing Synchronous Optical Network, or SONET, infrastructure, which was originally designed for voice communications, to transport video content throughout the network. This provides significant cost savings as telephone companies are not required to build a dedicated video transport network. They deploy our video application in network locations called video serving offices, or VSOs, that provide service directly to consumers. This product application leverages the same key technologies that were previously deployed in many of the largest cable operator networks in the world. Our TelcoTV product application integrates our core media processing modules with our BMR with built-in radio frequency, or RF, modulation, analog decoding and local content insertion. Our platforms have been engineered to comply with the Level-3 Network Equipment Building System standard, or NEBS, which is a set of telecommunications industry safety and environmental design guidelines for equipment in central offices.

*Switched Broadcast.* **We believe we were the first company to develop and commercially deploy a switched broadcast application.** Traditionally, service providers broadcast all channels to all subscribers at all times. **Our Switched Broadcast application enables service providers to transmit video channels to subscribers only when the subscribers in a smaller subset of subscribers within a network, called a service group, are in the process of watching those channels.** Depending on the number of subscribers and the amount of duplicate channels within a service group, **our Switched Broadcast product application typically allows service providers to achieve up to 50% bandwidth savings in the delivery of digital video content and use the reclaimed bandwidth to offer additional content.** This reclaimed bandwidth can be used to deliver niche video packages, more HDTV channels, high-speed data service and/or voice service. Service providers often use our Switched Broadcast product application as a means to free up the bandwidth to implement digital simulcast. ... In addition, our Switched Broadcast product application gives our service providers real-time access to the actual viewing habits of their subscriber groups, information that is

- 13 -

increasingly valuable as they and their advertisers seek to tailor advertising or personalized channel services to specific subscriber groups and individual subscribers.

We deliver our Switched Broadcast product application by combining our core media processing modules with our BMR, Switched Broadcast Session Server and Broadband Multimedia-Service Edge hardware platform, which we refer to as our BME.

***Data***

*High-Speed Data and Voice-over-IP.*   Our High-Speed Data product application enables cable operators to offer real-time services, such as VoIP and streaming video content over the Internet. Using our High-Speed Data product application, cable operators can offer different levels of data speeds, which can be tiered based on the level of subscriber fees or on real-time bandwidth needs. Our High-Speed Data product application offers redundancy characteristics and a distributed switch fabric with routing and forwarding capabilities across multiple application modules, instead of in a central core where switching latency can be exacerbated. As a result, those cable operators that are deploying voice services can leverage the ability of our High-Speed Data product application to reduce dropped packets and latency to deliver high-quality and reliable voice services.

***Modular CMTS is the next generation of our High-Speed Data product application, which is currently in multiple customer trials on three continents. Customers using our existing CMTS product will be able to cost-effectively upgrade to our M-CMTS platform. This will allow them to quadruple their downstream delivery capacity without additional CMTS equipment or next-generation cable modems. We accomplish this by combining a software upgrade with an external edge quadrature amplitude modulation, or QAM, modulator for downstream traffic, freeing up processing capacity in our CMTS to process more downstream traffic on the same hardware. We expect to begin commercial deployment of our M-CMTS product in the first half of 2007.*** [Emphasis added.]

40.    In describing the Company's sales process and oversight, the Registration Statement, in relevant part, stated:

***Our sales cycle for an initial customer purchase typically ranges from nine to eighteen months, but can be longer.*** This process generally involves several stages before we can recognize revenues on the sale of our products. As a provider of advanced technologies, we seek to actively participate with our existing and potential customers in the evaluation of their technology needs and network architectures, including the development of initial designs and

- 14 -

prototypes. Following these activities, we typically respond to a service provider's request for proposal, configure our products to work within our customer's network architecture, and test our products first in laboratory testing and then in field environments to ensure interoperability with existing products in the service provider's network. Following testing, our revenue recognition depends on satisfying complex customer acceptance criteria specified in our contract with the customer and our customer's schedule for roll-out of the product. Completion of several of these stages is substantially outside of our control, which causes our revenue patterns from a given customer to vary widely from period to period. *After initial deployment of our products, subsequent purchases of our products typically have a more compressed sales cycle.*

*Due to the nature of the cable and telecommunications industries, we sell our products to a limited number of large customers, which have varied over time. For the quarter ended December 31, 2006 and the years ended December 31, 2006, 2005 and 2004, we derived approximately 90%, 79%, 69% and 61% of our net revenues from our top five customers, respectively.* In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. *We believe that for the foreseeable future our net revenues will be highly concentrated in a relatively small number of large customers....* [Emphasis added.]

\* \* \*

*We sell our products and services to customers in the United States through our direct sales force.* We sell to customers internationally through a combination of direct sales and resellers. In the year ended December 31, 2006, approximately 89% of our sales were to customers in the United States and 11% were to customers outside the United States. Domestic sales for 2005 and 2004 accounted for 83% and 80% of our total sales, respectively, while sales to customers outside of the United States accounted for 17%, and 20% of our total sales, respectively. [Emphasis added.]

41.     The statements contained in ¶¶ 36 – 40 were materially false and misleading when made because the Registration Statement failed to disclose or indicate the following:  (1) that the Company's SDV products suffered from interoperability issues with regard to certain video infrastructure systems; (2) that the integration of the Company's SDV products required significant software customization and integration; (3) as such, growth of the Company's SDV products and

CLASS ACTION COMPLAINT

1  sales was stagnant; (4) that, as a result of the above, the Company would be forced to recognize the

2  revenue associated with its SDV product sales over an extended period of time; (5) that the

3  Company had shipped excess amounts of TelcoTV inventory to customers such as Verizon, which

4  reduced future demand for these products; and (6) that the Company lacked adequate internal and

5  financial controls.

6

7      42.    On May 3, 2007, the Company issued a press release entitled "BigBand Networks

8  Reports First Quarter 2007 Financial Results with 62% Increase in Year over Year Revenues and

9  Expanding Gross Margins."  Therein, the Company, in relevant part, stated:

10         BigBand Networks, Inc., (NASDAQ:BBND), a leading provider of
           broadband multimedia infrastructure for video, voice and data, today
11         announced financial results for the first quarter ended March 31,
           2007.
12

13         For the first quarter of 2007, BigBand Networks reported net
           revenues of $52.8 million, an increase of 62% over $32.6 million in
14         the first quarter of 2006. GAAP net loss for the quarter was $1.0
           million, or ($0.05) per diluted share, compared to a net loss of $1.1
15         million, or ($0.09) per diluted share, in the first quarter of 2006.
           GAAP net loss in the first quarter of 2007 includes an aggregate of
16         $7.5 million in non-cash charges (including $5.0 million in preferred
           stock warrant expense, $2.4 million in stock-based compensation
17         expense and $0.1 million in amortization of intangibles), while such
           non-cash charges represented an aggregate of $0.5 million in the first
18         quarter of 2006. A reconciliation of our GAAP and non-GAAP
           results is included as part of this release.
19

20                                    * * *

21         Gross margin improved to 57.5% on a GAAP basis and 58.0% on a
22         non-GAAP basis during the first quarter of 2007 from a gross margin
           of 51.2% in the first quarter of 2006 on both a GAAP and non-GAAP
23         basis.

24         "*During the quarter, we continued to see an expansion of our*
           *installed base of solutions and of the capacity of our existing*
25         *footprint*, which favorably benefited our gross margin," commented
           Amir Bassan-Eskenazi, chairman, president and CEO of BigBand
26         Networks.

27                                    * * *

28

CLASS ACTION COMPLAINT

BigBand Networks completed its initial public offering of common stock on March 20, 2007 and raised net proceeds of approximately $88 million through the issuance of 7.5 million shares. As of March 31, 2007, the Company had $144.6 million in cash, cash equivalents and marketable securities.

"*We are delighted to report strong financial results for the first quarter of 2007, our first quarter as a public company,*" continued Bassan-Eskenazi. "*Some of the world's largest cable and telecommunications carriers continue to demonstrate interest in our media services platforms*, built upon a unique combination of networking, video processing and bandwidth management capabilities.

"*We believe that our financial achievements to date demonstrate the increasing consumer demand for more and better video services, including high-definition programming. Our growth continues to be a function of the broader adoption of our switched broadcast solution by major cable operators and the increasing deployment of television services by telecommunications carriers*, among many other initiatives.

"Looking ahead, we are optimistic about our business and long-term market opportunity. *We expect to further leverage our platform and gain footprint with new customers in new geographies. BigBand Networks continues to innovate, and we believe our technology will remain a key point of differentiation in the future*," concluded Bassan-Eskenazi.

**Business Outlook**

* * *

**Fiscal Year Ending December 31, 2007**

- *Net revenues are anticipated to be in the range of approximately $225 to $230 million.*

- GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.4 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $115.0 to $120.0 million, which includes stock-based compensation of approximately $10.0 million and amortization of intangibles of $0.6 million.

- Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

CLASS ACTION COMPLAINT

- Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

- *This equates to GAAP earnings per share in the range of $0.06 to $0.11.* [Emphasis added.]

43.    Also on May 3, 2007, BigBand held a conference call with investors and financial analysts. During this call, Defendants Bassan-Eskenazi and Ball, in relevant part, stated:

> AMIR BASSAN-ESKENAZI: To our knowledge, BigBand Networks is *the only commercially deployed switched broadcast solution to date. We continue to believe that every major MSO will deploy switched broadcast at some point as the most cost-effective solution to manage bandwidth and expand programming and enable a new generation of personalized video services such as addressable advertising.*
>
> *In Q1, we saw continuing demand for our Telco TV solutions* as well. BigBand carrier-grade platform is deployed at the edge of our Telco customers networks and is used to ensure reliable and efficient delivery of TV programming. We continue to support the ongoing rollout of Verizon's FiOS TV. Our ability to successfully deploy with this important customer gives us the confidence in our platform fit for Telco TV, as well as validates our ability to add value to this important market segment.
>
> *The worldwide Telco TV market represents significant opportunity that is still ahead of us. It will take some effort and time, but we are excited and I'm sure that it will be a subject of further discussion in the future.*
>
>         * * *
>
> In closing, I'm very pleased with our performance during the quarter and the milestones we have achieved to date. We are optimistic about the potential for switched broadcast, Telco TV, the opportunity of M-CMTS, as well as other innovations that are not yet reflected in our revenues. *With our strong first quarter behind us, we are comfortable with our ability to post strong revenues growth in '07 and beyond, as Fred will discuss in more detail.*
>
>         * * *
>
> FRED BALL: ... Going forward, we continue to expect to see a higher concentration of video revenue and are expecting Q2 gross margins to be in the range of 54% to 56%, an increase from our previous expectations, but below Q1 2007. This is due to a decrease in service margins as we continue to increase service cost of sales to

- 18 -
CLASS ACTION COMPLAINT

support our growing install base and future installation activities, as well as a small decline in product gross margins.

* * *

Deferred revenues grew from $50.6 million to $56.6 million, reflecting strong service-renewal activity in the quarter. We tend to see a fair amount of service-renewal activity during the first quarter of every year, as a large portion of our customers renew their service contracts when they enter their new budget cycle.

*As I look out to the end of Q2, I would expect to see our deferred revenue balance flatten out or decline slightly, depending on the timing of order receipt and shipments during the quarter. Other than that, I don't expect that inventory and the other working capital balances will change significantly.*

Our guidance for Q2 2007 and for the full year 2007 is as follows. For Q2, net revenues are expected to be in the range of $52 million to $56 million, reflecting slower data product revenues as we transition to our M-CMTS solution. Gross margins are anticipated in the range of 54% to 56%. Operating expenses are expected to be approximately $28.5 million to $29.5 million on a GAAP basis, and approximately $25.5 million to $26.5 million on a non-GAAP basis, excluding approximately $2.7 million in stock-based compensation and amortization of intangibles.

* * *

*For the full year 2007, revenues are expected to be $225 million to $230 million. Gross margins are expected to expand to between 54% and 56%, from 2006 gross margins of 53%.*

* * *

[ANALYST]: Now your revenue guidance is a tad lower than expected. And we -- from your remarks, I understand this is mainly because of data revenues that are going to be more recognized in the second half of the year.

But did you expect these data revenues to come in the first and second quarters, and now they're being pushed out? Or is it that your existing customers say, "You know what? We're not buying it," and you were initially expecting it -- "We're not buying it now because you're coming out with a new product"?

FRED BALL: No. I don't think it's so much that. I think that as we are selling into these customers, the EAP and selling M-CMTS, I think there is a slight pause as they evaluate the road map and what

CLASS ACTION COMPLAINT

1  M-CMTS can do for them. And so we've seen orders and we've made
   some shipments, but it's just not revenue yet.
2

3                                    * * *

4  [ANALYST]: Can you give us some color on -- I think from your
   remarks I understood that some revenues were just not recognized
5  this quarter and next quarter, and it's a question of revenue
   recognition. Could you give us some -- ?
6

7  FRED BALL: It's -- yes. *It's the timing of revenue recognition and
   the full release of the product.*

8  [ANALYST]: Can you give us some color on the magnitude? Is it in
9  small -- just to understand how significant the number is.

10 FRED BALL: *I don't -- I wouldn't -- I guess I wouldn't read into it
   as being dramatic. But it is, clearly, trending in the right direction.*
11 [Emphasis added.]

12                    **The Truth Begins to Emerge**

13        44.    On August 2, 2007, the Company issued a press release entitled "BigBand Networks

14 Reports Second Quarter 2007 Financial Results; Revenues Increased 43% Year Over Year."

15 Therein, the Company, in relevant part, stated:

16
   BigBand Networks, Inc., (NASDAQ:BBND), a leading provider of
17 broadband multimedia infrastructure for video, voice and data, today
   announced financial results for the three and six months ended June
18 30, 2007.

19
   For the second quarter of 2007, BigBand Networks reported net
20 revenues of $54.5 million, an increase of 43% over the second quarter
   of 2006. GAAP net income for the quarter was $1.7 million, or $0.02
21 per diluted share, compared to a net loss of $0.6 million, or ($0.05)
   per share reported in the second quarter of 2006. Gross margin
22 improved to 53.4% on a GAAP basis from a gross margin of 48.7%
   in the second quarter of 2006. Operating income increased to $42,000
23 on a GAAP basis during the second quarter of 2007 from an
   operating loss of $0.4 million in the second quarter of 2006. GAAP
24 results for the second quarter of 2007 includes $2.9 million in stock-
   based compensation expense and $0.1 million in amortization of
25 intangibles. In the second quarter of 2006, we incurred $0.5 million in
   stock-based compensation expense, $0.1 million in amortization of
26 intangibles and $57,000 in preferred stock warrant expense. A
   reconciliation of our GAAP and non-GAAP results is included as part
27 of this release.
28

                                    - 20 -
                          CLASS ACTION COMPLAINT

* * *

*"We are pleased with our improvements in both revenues and earnings results in the second quarter," commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. "We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.*

* * *

*"Video continues to be a major driver of capital expenditures in service provider networks. We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business," concluded Bassan-Eskenazi.*

**Business Outlook**

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

**Quarter Ending September 30, 2007**

- *Net revenues are anticipated to be in the range of approximately $54 to $58 million.*

- GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $30 to $31 million, which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.

- Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

- Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.

- *This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.*

CLASS ACTION COMPLAINT

**Fiscal Year Ending December 31, 2007**

- *Net revenues are anticipated to be in the range of approximately $225 to $230 million.*

- GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.

- Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

- Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

- *This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.* [Emphasis added.]

45.    Also on August 2, 2007, BigBand held a conference call with investors and financial analysts. During this call, Defendants Bassan-Eskenazi and Ball, in relevant part, stated:

> AMIR BASSAN-ESKENAZI: ... I'm pleased to announce another solid quarter for BigBand Networks as we continue to scale our business. We are growing our top-line as a direct impact of the healthy demand for the unique video solutions which drive strategic footprint growth with key customers. Our bottom-line is strong and we continue to invest in network-changing innovation, and to build our proven deployment capability on a global basis.
>
> * * *
>
> FRED BALL: We had another very solid quarter. We saw revenue of 54.5 million, as Amir mentioned earlier, up 43% from the same period a year ago. For the six months ended June 30, revenues eclipsed 100 million, coming in at 107.3 million, an increase of 52% over the same period in 2006.
>
> * * *
>
> We continue to make steady progress in establishing footprint across our solution base. *We have also improved our ability to quickly deploy our Switched Broadcast solution. That said, it can still take*

CLASS ACTION COMPLAINT

1
2

*as long as six to nine months from order receipt to revenue due to a number of factors, including site readiness.*

3

* * *

4
5

Earnings per share for the quarter was $0.07 on fully diluted weighted average shares of 70.8 million.

* * *

6
7
8
9
10
11

*Let me recap our guidance for Q3 and fiscal year 2007. For Q3 we currently expect net revenues to be in the range of $54 to 58 million.* Gross margins are anticipated in the range of 53% to 55%. Operating expenses are expected to be approximately $30 to $31 million on a GAAP basis, and approximately $27 to $28 million on a non-GAAP basis. This excludes approximately $3 million in stock-based compensation and amortization of intangibles. Fully diluted weighted average shares are expected to be 71 to 72 million shares.

12
13
14

Our provision for income taxes in Q3 is expected to be between 500,000 and 600,000, reflecting a pro-rata portion of our expected full-year tax provision of $2 to $2.5 million. *This equates to GAAP EPS of $(0.01) to +$0.03 per share, and non-GAAP EPS of $0.03 to $0.07 per share.*

15
16
17

*For the full year 2007, we continue to expect full-year revenues of between $225 and $230 million.* That said, our current visibility indicates that we are more likely to be in the low-end of that range due to the impact of timing of receipt of customer acceptance on in-process Switched Broadcast deployments.

18

* * *

19
20
21
22
23

Note that full-year stock-based compensation has increased slightly from our previous estimate due to equity grants during the quarter. Full-year estimates assume a full-year tax provision of between $2 and $2.5 million. *Fully diluted weighted average shares for the full year are expected to be in the range of 69 to 71 million shares. This equates to GAAP EPS of $(0.03) to $0.08 per share, and non-GAAP EPS of $0.28 to $0.33.*

24
25
26
27

*In summary, the business continued to track against our expectations as we demonstrated solid year-over-year growth in gross margin expansion. We continue to drive operating profitability and cash flow, and we continue to grab footprint* and expand our presence in the markets surrounding Switched Broadcast, TelcoTV, and IPTV. [Emphasis added.]

28

- 23 -

46.    On this news, shares of the Company's stock fell $3.88 per share, or 27.75 percent, to close on August 3, 2007 at $10.10, on unusually heavy trading volume.

47.    Then on September 27, 2007, the Company issued a press release entitled "BigBand Networks Announces Revised Revenue Outlook for Third Quarter of 2007." Therein, the Company, in relevant part, stated:

> BigBand Networks, Inc., (NASDAQ:BBND) today revised its revenue outlook for the third quarter ending September 30, 2007. *The Company now expects to report revenue for the third quarter in the range of $35 to $39 million, which is below the Company's previous guidance of $54 to $58 million.*
>
> The lower revenue outlook is due to several coincident factors. *BigBand has been deploying switched digital video across an expanding number of customers and configurations. Some of these ongoing deployments have required more software customization and integration than originally expected.* This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter. *The Company also experienced slowdown in Telco-TV revenue, as its major customer worked through some previously purchased inventory. Finally, the Company experienced continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007.*
>
> "While we believe the market for our video solutions continues to be strong and are confident in our roadmap for the long term, we are clearly disappointed in our execution this quarter," said Amir Bassan-Eskenazi, BigBand's chief executive officer. "We are aggressively addressing these issues and will provide more specifics in our announcement of third quarter financial results in early November." [Emphasis added.]

48.    On this news, shares of the Company's stock declined an additional $2.67 per share, or almost 30 percent, to close on September 28, 2007 at $6.40 per share, also on unusually heavy trading volume.

- 24 -

CLASS ACTION COMPLAINT

49.     Later on September 28, 2007, *Bloomberg* published an article entitled "BigBand Falls to Lowest Since March IPO on Forecast." The article, in relevant part, stated:

> BigBand Networks Inc., a maker of equipment for online video, fell to the lowest since the company went public in March after cutting its third-quarter sales forecast on setbacks with its software.
>
> BigBand shares fell $2.67, or 29 percent, to $6.40 at 4 p.m. New York time in Nasdaq Stock Market composite trading. *It was the biggest drop and the lowest close since the company first sold shares on March 14. The stock has lost 51 percent since its debut.*
>
> *Sales are forecast to be as much as $39 million, down from an earlier projection of as much as $58 million,* the Redwood City, California-based company said in a statement after the close of trading yesterday. *The company now expects a third-quarter operating loss.*
>
> *At least three analysts cut their rating on the stock today. Jeffries & Co. lowered its rating to "hold" from "buy," Merrill Lynch & Co. to "neutral" from "buy," and Morgan Keegan Inc. to "hold" from "buy."*
>
> *Some products required more software customization than anticipated and there was "continued softness" in the data business,* BigBand said. [Emphasis added.]

50.     The market's reaction to the Company's shocking news is illustrated by an analyst report published by Morgan Keegan & Co., who in downgrading their recommendation of the Company's stock, stated:

> *BigBand has been a big disappointment for us.* We think the company has a cool product in a great market segment, but executing in an increasingly competitive and demanding environment has proven a greater challenge than we appreciated. *Management anticipates that the challenges affecting this quarter will cascade into at least the next several quarters; as such, our estimates fall precipitously and we think it will take the company some time to recover its momentum.*
>
> Management cited 3 factors that hurt business in Q3 and noted that the trends could last multiple quarters.
>
> **1. Telco inventory depletion:** Verizon is BigBand's key telco customer and represented over 40% of sales in 1H07. We believe Verizon's long term deployment plans have not changed, and we see

CLASS ACTION COMPLAINT

it as resuming spending during 2008 considering the importance of BigBand's solutions to its video strategy.

**2. Slower than expected SDV:** *BigBand has faced greater than expected challenges in rolling out Switched Digital Video than expected. We think customer demands have restricted BigBand's ability to recognize revenue. We also think interoperability issues have slowed sales, and our checks suggest that BigBand has had more issues working with Motorola's* (MOT, $18.69, M-M) *video infrastructure* that it has with Cisco's (Scientific Atlanta) (CSCO, $33.23, NR). We think the challenges can be addressed, but *growth will be modest and competition is increasing.*

**3. Data / CMTS demand softened:** Management sounds surprised by weak demand of its Cable Modem Termination Systems (CMTS), yet we have been surprised by the relative strength in light of our checks that Comcast and Time Warner Cable were replacing old BigBand CMTS' with ARRIS (ARRS, $12.34, O-S) gear in the former Adelphia networks. *We don't count on this business recovering.*

**Model Adjustments**

*We have greatly reduced our estimates to reflect a cascading effect from the challenges hurting Q3:07 results. We expect gross margin drops materially on the lower volume.* We doubt the company has much flexibility to cut costs because of the need to invest in R&D and sales and marketing, but it can slow spending growth. *Our Q3:07 sales go to $37.5 mm from $56.4 mm and we show a loss per share of ($0.14) from earnings per share of $0.06. For the full year, our sales go to $186 mm down from $227 mm and we show a loss of ($0.08) per share from earnings of $0.32 per share. The company may get close to break-even by late 2008* if Verizon recovers and costs are controlled. For 2008, sales go to $193 mm with a loss per share of ($0.21) from our previous $279 mm and $0.42 respectively.

| Model Adjustments | Old | | New | |
|---|---|---|---|---|
| | Sales | EPS | *Sales* | *EPS* |
| Q3:07E | $56.4 mm | $0.06 | *$37.5 mm* | *($0.14)* |
| FY07E | $226.6 mm | $0.32 | *186.2 mm* | *($0.08)* |
| FY08E | $278.6 mm | $0.42 | *192.6 mm* | *(0.21)* |

CLASS ACTION COMPLAINT

| Source: Morgan Keegan & Co. | | | | |
|---|---|---|---|---|

*Valuation*

*On the lower expectations, we see the stock as worth much less than our previous potential fair value of $14.70. With the company likely to show losses for some time,* we think the best metric to consider is the Enterprise Value to Sales ratio. By using the enterprise value rather than the market cap or share price, we give the company credit for its meaningful net cash position. Even with the losses we expect this quarter, we think BigBand will have nearly $2 in cash per share. *We believe the fair value of the stock may be $7.54 - $8.90 based on an enterprise value to CY08 sales ratio range of 2.0x-2.5x.*

**Recommendation**

*We reduce our BigBand rating to Market Perform from Outperform. The challenges affecting this quarter will cascade into multiple quarters and our estimates fall precipitously. The company likely delivers operating losses through 2008,* yet shows improvement as some key customers absorb inventory. ... [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BigBand's common stock pursuant or traceable to the Company's March 14, 2007 IPO, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BigBand's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

1   thousands of members in the proposed Class. Record owners and other members of the Class may

2   be identified from records maintained by BigBand or its transfer agent, and may be notified of the

3   pendency of this action by mail, using the form of notice similar to that customarily used in

4   securities class actions.

5

6       53.    Plaintiff's claims are typical of the claims of the members of the Class as all members

7   of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

8   complained of herein.

9       54.    Plaintiff will fairly and adequately protect the interests of the members of the Class

10  and has retained counsel competent and experienced in class and securities litigation.

11      55.    Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class.  Among the

13  questions of law and fact common to the Class are:

14

15          (a)     whether the federal securities laws were violated by defendants' acts as

16                  alleged herein;

17          (b)     whether statements made by defendants to the investing public during the

18                  Class Period misrepresented material facts about the business, operations and

19                  management of BigBand; and

20

21          (c)     to what extent the members of the Class have sustained damages and the

22                  proper measure of damages.

23      56.    A class action is superior to all other available methods for the fair and efficient

24  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

25  damages suffered by individual Class members may be relatively small, the expense and burden of

26  individual litigation make it impossible for members of the Class to individually redress the wrongs

27  done to them.  There will be no difficulty in the management of this action as a class action.

28

## UNDISCLOSED ADVERSE FACTS

57.    The market for BigBand's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, BigBand's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired BigBand's common stock relying upon the integrity of the market price of BigBand's common stock and market information relating to BigBand, and have been damaged thereby.

58.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of BigBand's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

59.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about BigBand's financial well-being and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of BigBand and its financial well-being and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

1

## LOSS CAUSATION

60.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

61.    During the Class Period, Plaintiff and the Class purchased common stock of BigBand at artificially inflated prices and were damaged thereby. The price of BigBand's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

62.    At all relevant times, the market for BigBand's common stock was an efficient market for the following reasons, among others:

(a)    BigBand stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, BigBand filed periodic public reports with the SEC and the NASDAQ;

(c)    BigBand regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    BigBand was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these

CLASS ACTION COMPLAINT

1    reports was publicly available and entered the public marketplace.

2    63.    As a result of the foregoing, the market for BigBand's common stock promptly

3    digested current information regarding BigBand from all publicly-available sources and reflected

4    such information in BigBand's stock price. Under these circumstances, all purchasers of BigBand's

5    common stock during the Class Period suffered similar injury through their purchase of the

6    Company's common stock at artificially inflated prices and a presumption of reliance applies.

7

8    **NO SAFE HARBOR**

9    64.    The statutory safe harbor provided for forward-looking statements under certain

10    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

11    Many of the specific statements pleaded herein were not identified as "forward-looking statements"

12    when made. To the extent there were any forward-looking statements, there were no meaningful

13    cautionary statements identifying important factors that could cause actual results to differ materially

14    from those in the purportedly forward-looking statements. Alternatively, to the extent that the

15    statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

16

17    liable for those false forward-looking statements, because at the time each of those forward-looking

18    statements was made, the particular speaker knew that the particular forward-looking statement was

19    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

20    of BigBand who knew that those statements were false when made.

21

22    **FIRST CLAIM**
    **Violation of Section 11 of**
23    **The Securities Act Against All Defendants**

24    65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

25    forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the

26    intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon

27    defendants' strict liability for making false and materially misleading statements in the Registration

28    Statement.

66.     This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the March 14, 2007 IPO.

67.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of BigBand and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

68.     Underwriter Defendants owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

69.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

CLASS ACTION COMPLAINT

70.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

71.    As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of BigBand's common stock sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of BigBand's common stock pursuant to the Registration Statement.

72.    BigBand is the issuer of the stock sold <u>via</u> the Registration Statement. As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

73.    At the times they obtained their shares of BigBand, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

74.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

75.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

### SECOND CLAIM
#### Violation of Section 12(a)(2) of
#### The Securities Act Against All Defendants

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

1    77.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of

2    the Class, against all defendants.

3    78.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered

4    pursuant to the BigBand Offering Registration Statement.

5

6    79.    The BigBand IPO Registration Statement contained untrue statements of material

7    facts, omitted to state other facts necessary to make the statements made not misleading, and

8    concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation

9    included participating in the preparation of the false the misleading Registration Statement.

10    80.    Defendants owed to the purchasers of BigBand's common stock, including Plaintiff

11    and other members of the Class, the duty to make a reasonable and diligent investigation of the

12    statements contained in the IPO materials, including the Registration Statement, to ensure that such

13    statements were true and that there was no omission to state a material fact required to be stated in

14

15    order to make the statements contained therein not misleading.  Defendants knew of, or in the

16    exercise of reasonable care should have known of, the misstatements and omissions contained in the

17    IPO materials as set forth above.

18    81.    Plaintiff and other members of the Class purchased or otherwise acquired BigBand's

19    common stock pursuant to and/or traceable to the defective Registration Statement.  Plaintiff did not

20    know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions

21

22    contained in the Registration Statement.

23    82.    Plaintiff, individually and representatively, hereby offer to tender to defendants that

24    common stock which Plaintiff and other Class members continue to own, on behalf of all members

25    of the Class who continue to own such common stock, in return for the consideration paid for that

26    common stock together with interest thereon.  Class members who have sold their BigBand common

27    stock are entitled to rescissory damages.

28

83.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold BigBand common stock purchased in the IPO have the right to rescind and recover the consideration paid for their BigBand common stock, and hereby elect to rescind and tender their BigBand common stock to the defendants sued herein. Plaintiff and Class members who have sold their BigBand common stock are entitled to rescissory damages.

84.     This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

**THIRD CLAIM**
**Violation of Section 15 of The Securities Act**
**Against the Individual Defendants**

85.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

86.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

87.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BigBand within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause BigBand to engage in the acts described herein.

88.     Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

89.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 18, 2007                    SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

Alan R. Plutzik, Of Counsel (Bar No. 077758)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

- and -

Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

- 36 -
CLASS ACTION COMPLAINT

I, (print name) _____ Abrena Winston _____ ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.       Plaintiff has reviewed the Complaint, and authorizes its filing.

2.       Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.       Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.       Plaintiff's purchase and sale transaction(s) in **BigBand Networks, Inc. (Nasdaq: BBND)** security that is the subject of this action during the Class Period is/are as follows:

PURCHASES

| Buy Date | Shares | Price per Share |
|----------|--------|-----------------|
| 5/22/2007 | 5.1158 | $18.57 |
| | | |
| | | |
| | | |
| | | |

SALES

| Sell Date | Shares | Price per Share |
|-----------|--------|-----------------|
| 6/29/2007 | 5.1158 | $13.28 |
| | | |
| | | |
| | | |
| | | |

Please list additional transactions and/or related securities (options, bonds, or preferred stock) on a separate piece of paper, if necessary.

5.       Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.       During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.       Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_ day of _____October_____, 2007_.

_____          ABRENA WINSTON
Signature                                                 Print Name